# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-1101V
UNPUBLISHED

| | |
|---|---|
| CHIAUITTA PURNELL-REID,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: April 6, 2020<br><br>Special Processing Unit (SPU);<br>Attorney's Fees and Costs;<br>Reasonable Basis; Good Faith |

*Bridget Candace McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Althea Walker Davis*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION ON ATTORNEY'S FEES AND COSTS[1]

On July 27, 2018, Chiaquitta Purnell-Reid filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on September 23, 2015. Petition at 1.

Medical records (provided to counsel directly from Petitioner) were filed concurrently with the Petition as Exhibits 1-5, including records from Peachtree Orthopedics (Exhibit 2). Then, on June 19, 2019, Petitioner filed (as Exhibit 12) a second version of the same records, but this set had been obtained directly from Peachtree Orthopedics. When compared to previously-filed Exhibit 2, however, Exhibit 12 contained

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the ruling will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

numerous material differences and inconsistencies. Because such inconsistencies cast doubt on the strength of the claim, Petitioner sought dismissal of the case on June 19, 2019, and that motion was granted on July 27, 2019.

Petitioner thereafter requested an award of fees and costs on July 27, 2019. *See* ECF No. 23 ("Pet. Mot."). Now, having considered the motion and Respondent's opposition to it, I DENY any such award in this case. As discussed below, I find that the claim overall lacked reasonable basis. The Petition was not filed in good faith, and it also lacked sufficient objective evidentiary support.

I.    **Procedural History**

On July 27, 2018, Ms. Purnell-Reid initiated this case, alleging that she had suffered a right shoulder SIRVA resulting from a flu vaccine administered on September 23, 2015. Petitioner further alleged that this was a Table injury, that the symptoms began within 48 hours of the vaccination, and that her symptoms lasted for more than six months. Petition at 1.

Five exhibits accompanied the Petition, including a sworn affidavit. Those exhibits confirmed that Petitioner received a flu vaccine on September 23, 2015, and that her injury lasted more than six months. *See* Ex. 1 at 2 (proof of vaccination); Ex. 4 at 1-6 (physical therapy records from July 10, 2017). Petitioner's affidavit also supports the allegations, stating that she began experiencing pain in her right shoulder a few hours after receiving the flu shot, and that the pain lasted for more than six months. Ex. 5 at 1.

Records from Peachtree Orthopedics elaborated on the claim – in both positive and negative ways. On the one hand, such records confirmed that Petitioner had complained about her right shoulder pain on October 8, 2015, stating that her pain began roughly two weeks prior. Ex. 2 at 22. However, that same record alludes to a longer course of treatment, stating "[g]iven the chronicity of her pain and lack of improvement with formal physical therapy and injections, we'll preform an MRI on her right shoulder." Ex. 2 at 22.[3] Further, there are also references to shoulder pain from as early as August 2, 2012 – predating vaccination by *three years*.[4] In addition, the completeness of the records is unclear, as at least some of the records filed with the petition appear to have been requested and paid for by another law firm. *See* Ex. 2 at 1, 3 (indicating records

---

[3] No physical therapy records were filed that refer to treatment prior to October 8, 2015.

[4] *See, e.g.*, Ex. 3 at 22 (record from August 2, 2012 reporting pain in shoulder region); *id* at 57 (record from November 15, 2012, included pain in shoulder region as a problem); *id.* at 50-51 (record from November 5, 2013 listing problems as shoulder joint pain and disorder of shoulder); *id.* at 149 (record from November 3, 2014 describing Petitioner's shoulder pain and reduced range of motion); *id.* at 82 (record from February 3, 2015 requesting refill on medication for swelling in Petitioner's shoulder); *id.* at 77 (record from December 26, 2014 including enthescopathy of shoulder region in list of Petitioner's problems).

requested by the law firm Maglio, Christopher & Toale on November 26, 2016, and paid for on February 3, 2017); Ex. 3 at 105 (indicating records requested by the law firm Maglio, Christopher & Toale on November 30, 2016).

Petitioner filed additional records, requested directly from providers, between October and November of 2018.  ECF Nos. 6-10.  The updated evidence included urgent care records indicating that Petitioner's previous shoulder pain involved her left shoulder.  Ex. 7 at 3, filed on October 9, 2019.  Petitioner also submitted a supplemental affidavit detailing her injury.  Ex. 8.  In it, she reported that prior to the flu vaccine on September 23, 2015, she enjoyed a healthy, active lifestyle and had no recurring health problems.  *Id.* at 1.  Further, Petitioner avowed that her injury had caused her to miss an estimated 10½ weeks of work, necessitating her to use a "great deal of [her] vacation time", putting her job in jeopardy, and resulting in her removal from a lucrative project.  *Id.*

On April 4, 2019, Respondent submitted a status report confirming that he had reviewed Exhibits 1-10 and noting a number of possible outstanding records and discrepancies.  ECF No. 17.  For example, Respondent noted that Petitioner's proof of vaccination did not identify the site of vaccination.  *Id.* at 1.  Respondent also noted that certain records appeared incomplete, such as the records from Peachtree Orthopedics that referred to chronic pain and formal physical therapy.  *Id.* at 1-2 (describing Ex. 2 at 22).  Respondent further noted that Petitioner's medical records refer to pre-vaccination shoulder pain from August of 2012.  *Id.* at 2 (describing Ex. 3 at 18, 148; Ex. 7 at 3).  Respondent requested records of physical therapy prior to October 8, 2015, and records associated with prior reports of shoulder pain from 2012 and 2014.  *Id.*

Petitioner did not file the records described in Respondent's status report, but instead filed a Motion for a Decision Dismissing Her Petition ("Mot. to Dismiss") on June 19, 2019.  ECF No. 20.  The motion stated that an investigation of the facts and science supporting Petitioner's case had demonstrated that she would be unable to prove that she is entitled to compensation in the Vaccine Program.  Mot. to Dismiss at 1.  The motion further stated that Petitioner was initially represented by another firm that had requested records from Peachtree Orthopedics filed as Exhibit 2, and that those records were later provided to counsel of record in this matter by Petitioner.  *Id.* at 1-2.  But the other Peachtree Orthopedics records (obtained in compliance with Respondent's April 4, 2019 status report and the April 5, 2019 Scheduling Order (ECF No. 18)),[5] filed as Exhibit 12, seemed to establish onset of petitioner's pain well before the September 2015 flu vaccine

---

[5] The records were requested on May 2, 2019.

- thus directly contradicting allegations set forth in the petition, Petitioner's affidavits, and previously-submitted records.[6]

The dismissal motion otherwise provided no explanation regarding how or why two significantly different versions of records from Peachtree Orthopedics purportedly describing identical medical care exist. At most, it acknowledged that Petitioner was aware of the two conflicting sets of records, and that she wanted to voluntarily dismiss her claim. Mot. to Dismiss at 2. An order concluding the proceedings was filed on June 19, 2019. ECF No. 21.

## II.  Comparison of Records

Comparing the two versions of the Peachtree Orthopedic records shows inconsistencies in reporting at least six separate visits between October 8, 2015, and December 1, 2015. Respondent provided a summary of the key differences in his Opposition to Petitioner's Application for Attorney's Fees, dated September 9, 2019 (ECF No. 25) ("Res. Opp."), showing that some notations regarding the chronicity of Petitioner's pain had been altered or removed in the version filed with the Petition:

The following information is contained in Dr. Griffith's assessment and plan at this visit in the records filed in Exhibit 2:

> 49-year-old right-hand-dominant active healthy female **who presents right shoulder pain for the roughly 2 weeks now.** There is no specific traumatic inciting incident. The patient is noted anterior and lateral right shoulder pain worsened with overhead maneuvers, elevation, and reaching. **She indicates her pain started after getting a flu shot. She says her pain is worst at night and rarely has a night** without waking up secondary to the pain. She endorses related stiffness and weakness. She presents for further evaluation. She has no infectious symptoms or radiating radicular symptoms. X-rays reveal type II subacromial spur with acromioclavicular osteoarthritis and preserved acromiohumeral interval. Physical examination reveals some evidence of adhesive capsulitis with slightly restricted elevation and internal rotation but pronounced weakness of the supraspinatus distribution with positive bicipital and impingement signs. She does have acromioclavicular arthritis on the x-rays but this is not symptomatic on exam. Given the chronicity of her pain and lack of improvement with formal physical therapy and injections, we'll perform an MRI of her right shoulder. This will be with contrast dye. We will evaluate her rotator cuff capsule

---

[6] For example, compare Ex. 2 at 7 (describing a visit with Dr. Griffith on December 1, 2015 for right shoulder pain and listing the date of injury as September 25, 2015) with Ex. 12 at 21 (describing the same visit but listing the date of injury as "8 months ago").

> biceps and additional structures. She will follow-up with the results we'll proceed accordingly. She has declined further steroid injections and oral anti-inflammatories. All questions answered in detail. She is in agreement with the plan.

Ex. 2 at 22 (emphasis added). In contrast, the record of the same visit included in Exhibit 12 contains different information regarding petitioner's condition on that date:

> 49-year-old right-hand-dominant active healthy female **who presents with a 9 month history of right shoulder pain**. There is no specific traumatic inciting incident. The patient is noted anterior and lateral right shoulder pain worsened with overhead maneuvers, elevation, and reaching. **She notices her pain particularly at night** and rarely has a night without waking up secondary to the pain. She endorses related stiffness and weakness. **She was diagnosed by another physician 8 months ago as having a frozen shoulder was provided a steroid injection and physical therapy. The steroid injection provided temporary relief. With the physical therapy and exercise program, she regained most of her range of motion. She has had persistent pain and weakness.** She presents for further evaluation. She has no infectious symptoms or radiating radicular symptoms. X-rays reveal type II subacromial spur with acromioclavicular osteoarthritis and preserved acromiohumeral interval. Physical examination reveals some evidence of adhesive capsulitis with slightly restricted elevation and internal rotation but pronounced weakness of the supraspinatus distribution with positive bicipital and impingement signs. She does have acromioclavicular arthritis on the x-rays but this is not symptomatic on exam. Given the chronicity of her pain and lack of improvement with formal physical therapy and injections, we'll perform an MRI of her right shoulder. This will be with contrast dye. We will evaluate her rotator cuff capsule biceps and additional structures. She will follow-up with the results we'll proceed accordingly. She has declined further steroid injections and oral anti-inflammatories. All questions answered in detail. She is in agreement with the plan.

Ex. 12 at 37. A comparison of the highlighted information noted above from Exhibits 2 and 12 illuminates the information that was altered or removed from Exhibit 2; it was the *altered records* that were filed in support of the petition for vaccine compensation. Of particular note is the alteration in Exhibit 2 that adds a reference to onset of pain following a flu vaccine, which is clearly absent from Exhibit 12. Moreover, the onset of pain was changed to two weeks in Exhibit 2, whereas Exhibit 12 documents a nine (9) month history of right shoulder pain.

5

In addition, at Petitioner's follow-up visit on October 29, 2015, following an MRI, the assessment and plan recorded at that visit, as documented in Exhibit 2, stated the following:

> Patient returns. MRI of the right shoulder reveals severe tendinosis of the supraspinatus tendon. There is partial thickness tearing. She is a type II subacromial spur and os acromiale. There is evidence of biceps tendinitis. There may be evidence of an inferior capsular tear. She has no evidence of instability symptoms on physical examination. Her range of motion markedly improved after this maneuver incidentally. Examination reveals persistent painful impingement signs with supraspinatus weakness and positive bicipital provocative signs. We discussed continued attempted conservative treatment. We discussed a repeat steroid injection and she is interested. This performed in the subacromial space without difficulty. She'll continue with formal physical therapy for 6 more weeks. We will reevaluate at that time. If not improved, surgical treatment may be reasonable. All questions answered in detail.

Ex. 2 at 19. However, the record of the same visit in Exhibit 12 contained the following assessment and plan:

> Patient returns. MRI of the right shoulder reveals severe tendinosis of the supraspinatus tendon. There is partial thickness tearing. She is a type II subacromial spur and os acromiale. There is evidence of biceps tendinitis. There may be evidence of an inferior capsular tear. **This goes in line with her previous treatment for adhesive capsulitis where she was given a painful manipulation by a chiropractor.** She has no evidence of instability symptoms on physical examination. Her range of motion markedly improved after this maneuver incidentally. Examination reveals persistent painful impingement signs with supraspinatus weakness and positive bicipital provocative signs. We discussed continued attempted conservative treatment. **She is already been putting up with her pain for 9 months.** We discussed a repeat steroid injection and she is interested. This performed in the subacromial space without difficulty. She'll continue with formal physical therapy for 6 more weeks. We will reevaluate at that time. If not improved, surgical treatment may be reasonable. All questions answered in detail.

Ex. 12 at 33 (emphasis added). The highlighted information shown above from Exhibit 12, that discusses the chronicity of petitioner's pain and her prior treatment, is not contained in the record of this visit in Exhibit 2. *See* Res. Opp. at 11-14.

6

There are additional examples of alterations and inconsistencies between Exhibit 2 and Exhibit 12. For example, Exhibit 2 describes a visit on November 20, 2015 for right shoulder pain and a partial thickness rotator cuff tear, and lists the date of injury as September 25, 2015. Ex. 2 at 9. That same visit was described in Exhibit 12 but lists the date of injury as "8 months ago". Ex. 12 at 23.[7]

### III. Fees Request

On July 27, 2019, Petitioner filed the present Application for Attorney's Fees. Petitioner requested $7,311.00 in fees and $627.69 in costs, for a total request of $7,938.69. Pet. Mot. at 2. Petitioner did not address whether the petition was brought in good faith or had a reasonable basis.

Respondent filed a response, opposing any award on September 9, 2019. *See generally* Res. Opp. Respondent argues that Petitioner lacked good faith when she filed her petition, and that the petition lacked objective evidentiary support – meaning it overall possessed insufficient reasonable basis. Res. Opp. at 10-18.

Petitioner filed a reply on September 13, 2019, arguing that the claim was filed in good faith and possessed objective support. Petitioner's Reply to Respondent's Opposition to Petitioner's Motion for Attorneys' Fees and Costs ("Pet. Reply"), ECF No. 26. The reply does not address Respondent's assertions that Petitioner did not have good faith when she asserted this claim.

### IV. Legal Standard

When a petition does not result in compensation, a special master "may" award reasonable attorney's fees and costs "if the special master determines that the petition was brought in good faith and there was a reasonable basis for which the petition was brought." § 300aa-15(e)(1). The Federal Circuit has reasoned that in formulating this standard, Congress "intended to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims." *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1362 (Fed. Cir. 2012).

---

[7] For additional examples, compare Ex. 2 at 7 (record from December 1, 2015 listing date of injury as September 25, 2015 and that Petitioner "states her shoulder hurts a little more today because she held a baby over the holiday as well as carrying her purse.") with Ex. 12 at 21 (record from December 1, 2015 listing date of injury as "8 months ago" and that Petitioner "states her shoulder hurts a little more today because she hed [sic] a baby a lot over the holiday as well as did a lot of shopping carrying her purse."); Ex. 2 at 9 (record from November 20, 2015 listing date of injury as September 25, 2015) with Ex. 12 at 23 (record from November 20, 2015 listing date of injury as "8 months ago"); Ex. 2 at 11 (record from November 16, 2015 stating Petitioner "started losing [range of motion] then a frozen shoulder 9/2015. She's been unable to use her R[ight] shoulder since.") with Ex. 12 at 25 (record from November 16, 2015 stating Petitioner "had a frozen shoulder about 8 months ago. She has been having problems with it ever since then. She has stopped using her R[ight] shoulder since…. She got an injection 2 weeks ago and this helped her pain.").

A special master may exercise his or her discretion in awarding attorney's fees and costs. However, the decision may be reviewed to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1383-84 (Fed. Cir. 2011)).

"Good faith" and "reasonable basis" are two separate elements that must be met for Petitioner to be eligible for attorneys' fees and costs. *Simmons*, 875 F.3d at 635 (Fed. Cir. 2017) (citing *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 289 (2014).

### A. Good Faith

#### a. Legal Standard

Good faith is a subjective standard. *Simmons*, 875 F.3d at 635. As previous cases have pointed out, the term is not defined in the Vaccine Act, and the legislative history provides no helpful context. *See Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *4 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Thus, the term's plain meaning, as provided by definitions from legal dictionaries or case law, is the basis for understanding "good faith" in the Vaccine Program. *Id., Crowding v. Sec'y of Health & Human Servs.,* No. 16-876V, 2019 WL 1332797, at *9 (Fed. Cl. Spec. Mstr. Feb. 26, 2019).

Black's Law Dictionary defines good faith as a "state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Black's Law Dictionary (11th ed. 2019). The converse, bad faith, involves conduct indicating "dishonesty of belief, purpose, or motive." *Id.* In the Vaccine Program, a petitioner is "entitled to a presumption of good faith as is the government." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). A special master is justified in presuming good faith "in the absence of direct evidence of bad faith." *Id.* Some special masters have, however, noted that claimants have an affirmative obligation to *establish* good faith, just as they must come forward with objective proof to support the claim. *See, e.g.*, *Spahn v. Sec'y of Health & Human Servs.*, No. 09-386V 2017 WL 6945560 at *1 (Fed. Cl. Spec. Mstr. Dec. 13, 2017 (stating that in a claim that did not receive compensation, a petitioner must establish that the petition was brought in good faith and there was a reasonable basis for the claim before receiving fees and costs).

8

Cases that have evaluated good faith, but found it lacking, involved demonstrations of the petitioner's knowledge that the alleged vaccine injuries had more likely alternative causes, such as child abuse; their refusal of further vaccines; their communications with counsel and experts; and their conduct in prosecuting claims once they are filed. *Heath v. Sec'y of Health & Human Servs.*, No. 08-86V, 2011 WL 4433646 (Fed. Cl. Spec. Mstr. Aug. 25, 2011); *Moran v. Sec'y of Health & Human Servs.*, No. 07-363V, 2008 WL 8627380 (Fed. Cl. Spec. Mstr. Dec. 12, 2008); *O'Dell v. Sec'y of Health & Human Servs.*, No. 89-42V, 1991 WL 123581 (Fed. Cl. Spec. Mstr. June 19, 1991).

Additionally, a petitioner's attorney's conduct may also be relevant when evaluating good faith. Recent cases suggest that counsel's duty to investigate the factual basis prior to asserting a claim bears on the good faith question. *See, e.g.*, *Simmons*, 875 F.3d at 636 ("an impending statute of limitations deadline may relate to whether 'the petition was brought in good faith' by counsel"), *see also Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018) ("the effort that an attorney makes to investigate a claim or to ensure that a claim is asserted before the expiration of the statutory limitations period .... are properly evaluated in determining whether a petition was brought in good faith"); *Crowding*, 2019 WL 1332797 at *12.

Two cases have evaluated good faith when there are altered medical records, *Carter v. Sec'y of Health & Human Servs.*, and *Crowding*. In *Carter*, a pro se petitioner's claim was held as lacking good faith based on evidence of medical records with "obvious" alterations designed to benefit the claim. *Carter v. Sec'y of Health & Human Servs.*, No. 90-3659V, 1996 WL 402033 (Fed. Cl. Spec. Mstr. July 3, 1996). Moreover, when an attorney later entered an appearance in that case, the attorney also acted in bad faith by not taking note of the obvious alterations. The special master reasoned that counsel "had an obligation to review thoroughly the records." *Id.* at *3. Counsel should have recognized that there were several copies of the same records with "obvious" alterations and then inquired about the discrepancy. *Id.* The special master "did not conclude that [counsel] was aware of the forged medical records – only that he should have been aware." *Id.* at *4. The special master reasoned that by supporting the claim and not drawing attention to the altered records, counsel "represented to the Court that he believed the petition was filed in good faith and had a reasonable basis." *Id.* at *3.

*Crowding* is a more recent case involving a petitioner who alleged a left shoulder SIRVA following a September 23, 2014 flu vaccine. *Crowding*, 2019 WL 1332797at *1. Three sperate medical visits between September 23, 2014 and October 21, 2014, did not indicate any reference to shoulder pain. *Id.* at *1-2. Petitioner subsequently filed a letter followed by medical records that included references to shoulder pain in medical visits between September 23, 2014 and October 21, 2014. *Id.* at *4. However, after additional investigations, testimony established that the records were not amended by petitioner's

treating physician (who was no longer practicing medicine), but by the office manager after the petitioner requested the records be amended. *Id.* at *5. Further, at no point did the petitioner clarify her role in generating the amended records, and also refused to voluntarily dismiss the case. *Id.* at *11. The Special Master found that the petitioner lost the presumption of good faith upon filing the medical records amended by the office manager. *Id.* at *11. The special master also concluded that petitioner's counsel lost the presumption of good faith by filing the additional records without investigating. *Id.* at *14-*15.

### b. Parties' Positions

Petitioner's application for fees and costs does not address good faith. *See* Pet. Mot. Respondent, however, addressed good faith in his opposition, asserting that Petitioner lacked good faith when she filed her petition because she knew that her arm pain preceded her flu vaccination but proceeded anyway, employing altered records to assist her claim. Res. Opp. at 14. Further, Respondent asserts that Petitioner's counsel acted without good faith by failing to satisfy the duty to investigate the claim, including to review thoroughly the records filed in support of the petition. *Id.* at 15. Respondent argues that the records available to Petitioner's counsel prior to filing the petition indicated that the shoulder pain was not contemporaneous with the vaccination as Petitioner alleged but was a chronic problem that began prior to her flu vaccine. *Id.* at 16.

In reply, Petitioner states that the petition was filed in good faith because Petitioner's counsel made reasonable inquiries under the circumstances. Pet. Reply at 8. Her counsel further asserts that Petitioner's records, including Exhibit 2, did not contain any obvious alterations, and otherwise "appear[ed] to be certified records requested by another law firm that has a strong presence in the Vaccine Program." *Id.* at 9. Until Petitioner's counsel received and reviewed the subsequent records obtained directly from Peachtree Orthopedics, the inconsistencies were not obvious, but immediately moved to dismiss the Petition when the discrepancies were evident. *Id.* at 10.

### c. Discussion

At a minimum, Petitioner *herself* acted in bad faith – thus providing grounds alone to find no reasonable basis for the filing of this case. As the records clearly show, Petitioner experienced right shoulder pain prior to the September 23, 2015 flu vaccination. Indeed, references in the records from Peachtree Orthopedics indicate Petitioner's right shoulder pain began as early as January of 2015, nine months prior to her flu vaccination. Ex. 12 at 36 (visit to Peachtree Orthopedics on October 8, 2015, stating Petitioner presented with a nine month history of right shoulder pain); Ex. 12 at 38 (record of right

shoulder MRI from October 28, 2015 stating that Petitioner had shoulder pain for ten months).[8]

Thus, Petitioner knew (or should have known) that her arm pain preceded her vaccination. Res. Opp. at 14. However, instead of addressing the prior shoulder pain, Petitioner alleged a Table Injury and repeatedly asserted that her right shoulder pain began within 48 hours of her September 23, 2015 vaccination. Petition at 1-2, 4; Ex. 5 at 1 (Petitioner's affidavit stating that she experienced pain in her right shoulder within forty-eight hours of receiving the flu vaccination); Ex. 8 at 1 (Petitioner's supplemental affidavit stating that, prior to her vaccination, she did not have any recurring health problems and lived a healthy and active lifestyle). Moreover, the factual basis for Petitioner's claim included material alterations and omissions misrepresenting onset, and she was likely aware of this factual misrepresentation at the time of filing.

Based on the record, it is impossible to discern who altered the records, how or when multiple versions of records were created, or when Petitioner became aware of the two sets of records. However, Exhibit 12 appears to be the accurate version of records from Peachtree Orthopedics, because they were obtained directly from the provider and are consistent with references in other medical records. Additionally, Petitioner does not dispute their accuracy. At no point did Petitioner provide an explanation as to how two sets of records came into existence, or why those filed with the petition (Exhibit 2) seem specifically tailored to support a table SIRVA with regard to onset.[9]

The specific nature of the differences between Exhibits 2 and 12 (namely the removal or alteration of many references to shoulder pain prior to Petitioner's September 23, 2015 flu vaccine administration), the fact that Petitioner provided the altered version to her counsel, and that she was aware of two sets of records, have all been persuasively established. I therefore find that Petitioner did not act in good faith when she filed her claim.

Whether counsel also acted in good faith presents a closer question. As noted in *Crowding*, counsel has a duty to investigate the claim, including an obligation to "review thoroughly" the records filed in support of the petition. *Crowding*, 2019 WL 1332797, at

---

[8] Additional references to Petitioner's shoulder pain beginning prior to her flu vaccination is available at Ex. 12 at 21 (visit to Peachtree Orthopedics on December 1, 2015, stating that petitioner had right shoulder pain and listing date of injury as 8 months prior); Ex. 12 at 23 (visit to Peachtree Orthopedics on November 20, 2015, stating that petitioner had a partial thickness rotator cuff tear and right shoulder pain and listing date of injury as 8 months prior).

[9] I will not speculate with regard to how the medical records became altered, or who was responsible for creating the discrepancies. For the purpose of this decision it is sufficient that Petitioner knew, or should have known, that there were material omissions and misrepresentations in the petition supported by clearly erroneous medical records provided to counsel by Petitioner.

*10.  Petitioner's counsel, however, simply filed Exhibit 2, the version of the Peachtree Orthopedics records that was provided by Petitioner.  Pet. Reply at 9, Pet. Mot. at 1.  Petitioner's counsel argues that there was no indication that the records appeared inaccurate or altered, and they "in fact appear to be certified records requested by another law firm that has a strong presence in the Vaccine Program."  Pet. Reply at 9.  Counsel thus appears to believe that no thorough investigation was required under the circumstances.

Yet there was ample evidence available at the time the Petition was filed that undermines Petitioner's allegations, including numerous references to prior shoulder pain.  For example, Petitioner's records from Duluth Family Medicine list pain in shoulder region, shoulder joint pain, and disorder of shoulder in at least six different visits dating between August 2, 2012 (Ex. 3 at 22) and February 4, 2015 (Ex. 3 at 77).  Petitioner's shoulder pain is also referred to as chronic in the Peachtree Orthopedic records provided to counsel and filed with the petition.  Ex. 2 at 22 ("Given the chronicity of her pain and lack of improvement with formal physical therapy and injections…").  However, there is no reference to the contradictory evidence in the Petition or affidavits, strongly suggesting that counsel's lack of awareness of those facts was due to a lack of investigation.

I recognize that there are instances where counsel cannot readily evaluate the accuracy or authorship of medical records.  However, here there were numerous indications that should have alerted counsel some investigation other than a cursory review of records provided by Petitioner was appropriate.  At the same time, I am reluctant to equate attorney negligence in performing his or her duties with bad faith (which implies acting with *actual knowledge* that materials necessary to support a claim exist and are contrary to the claim, or persisting in a claim with knowledge that records that purportedly support it have been intentionally altered).  Regardless, because it is very evident that *Petitioner's* conduct fails the good faith test, an award of fees is not appropriate regardless of whether counsel also so acted.

## B. Objective Basis

### a. Legal Standard

I have in prior decisions set forth at length the criteria to be applied when determining if a claim possessed "reasonable basis" sufficient for a fees award.  *See, e.g., Allicock v. Sec'y of Health & Human Servs.*, No. 15-485V, 2016 WL 3571906, at *4–5 (Fed. Cl. Spec. Mstr. May 26, 2016), *aff'd on other grounds*, 128 Fed. Cl. 724 (2016); *Gonzalez v. Sec'y of Health & Human Servs.*, No. 14-1072V, 2015 WL 10435023, at *5–6 (Fed. Cl. Spec. Mstr. Nov. 10, 2015).  In short, a failed claim can still result in a fees award, but some objective support for the claim must be demonstrated as part of the petitioner's overall reasonable basis showing.  *See Chuisano v. Sec'y of Health & Human*

*Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)).

The Court of Federal Claims has provided additional guidance, ruling that, under the objective standard articulated in *Simmons*, analysis of reasonable basis should be limited to "the claim alleged in the petition" to determine if it was objectively feasible based on the materials submitted. *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Spec. Mstr. Jan. 5, 2018).

### b. Parties' Position

Respondent asserts in his Opposition that the records filed with the Petition, specifically Exhibit 2, raised concerns about the validity of the claims. Res. Opp. at 25.

Petitioner argues in response that the claim had a reasonable basis when filed. Pet. Res. At 2-4. The records provided by Petitioner appeared to be accurate and complete on their face, with no obvious alternations. *Id.* at 5. Petitioner does recognize that there were factual issues with Petitioner's claim - notably the vaccination record does not indicate which arm she received the flu vaccine and that the records indicate shoulder pain prior to September 2015. However, counsel argues that Petitioner represented that she experienced frozen shoulder in her left shoulder in August of 2014, which was corroborated by records filed on October 9, 2018. Therefore, based on what was known at the case's outset, the claim was viable and any reference to prior shoulder pain could feasibly be attributed to Petitioner's left shoulder by a finder of fact.

### c. Discussion

Even if the claim possessed good faith as of filing, I would still find herein that the case lacked reasonable basis, given the lack of objective support sufficient to support the filing of the Petition. Petitioner alleged that she received a flu vaccine in her right shoulder on September 23, 2015, and that she began to experience pain within 48 hours of the vaccination. Petition at 1-2. Additionally, because the claim was couched as a table injury, Petitioner had to establish no history of pain, inflammation, or dysfunction of the affected shoulder prior to the vaccine. 42 CFR § 100.3 (c)(10)(2017).

In this case, however, there was ample evidence available at the time the Petition was filed that undermined Petitioner's allegations, including numerous references to shoulder pain prior to Petitioner's September 23, 2015 flu vaccine. For example, Petitioner's records from Duluth Family Medicine list pain in shoulder region, shoulder joint pain, and disorder of shoulder at least six different visits dating between August 2, 2012 (Ex. 3 at 22) and February 4, 2015 (Ex. 3 at 77). *See, e.g.*, Ex. 3 at 22 (refers to pain in shoulder region on August 2, 2012); Ex. 3 at 50-51 (problems include shoulder

joint pain and disorder of shoulder on November 5, 2013); Ex. 3 at 148 (diagnosed with disorder of shoulder on November 3, 2014); Ex. 3 at 82 (requested refill for medication for swelling in her shoulder on February 3, 2015). In addition, there are numerous references and allusions to Petitioner's shoulder pain being chronic as early as October 8, 2015. *See, e.g.*, Ex. 2 at 22 (record from October 8, 2015 stating "Given the chronicity of her pain and lack of improvement with formal physical therapy and injections…."); Ex. 2 at 11 (physical therapy records stating petitioner "starting losing [range of motion] then frozen shoulder 09/2015. She's been unable to use her R[ight] shoulder since").

Here, there was a lack of objective evidence sufficient to bring this claim. This evidentiary insufficiency was amplified by counsel's admittedly cursory review of the record before filing the action. Pet. Reply at 5. While I understand counsel only possessed some of the medical records, the review of those records was not diligent because as described above, those records contained numerous references to earlier shoulder pain years prior to the September 23, 2015 vaccination. The weaknesses of the claim could have been identified from the outset of filing.

Even if some of the weaknesses in the claim could have been overcome, their existence was not acknowledged. There is no reference or explanation for the prior shoulder pain in the petition, and the supporting documents that indicate Petitioner experienced a left frozen shoulder were not filed until October 9, 2018, over two months after the petition was filed. ECF No. 9-2. Further, a supplemental affidavit filed on October 18, 2018, also fails to provide any explanation or description of her earlier shoulder pain. *See* Ex. 8. Counsel's claim that she knew of this prior condition, and that it affected Petitioner's left shoulder, appear to be little more than explanations after the fact with no supporting contemporaneous evidence.

## V.     Conclusion

Accordingly, for the reasons set forth above, Petitioner's Motion for Attorney's Fees and Costs is denied. The clerk of the court is directed to enter judgment in accordance with this decision.[10]

**IT IS SO ORDERED.**

s/Brian H. Corcoran<br>
Brian H. Corcoran<br>
Chief Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.